## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO:** |
| | : | **3:19 CR 253 (JCH)** |
| **v.** | : | |
| | : | |
| | : | |
| **BRIAN GREGAN** | : | **JANUARY 8, 2020** |

### DEFENDANT BRIAN GREGAN'S
### MEMORANDUM IN AID OF SENTENCING

The Defendant, Brian Gregan ("Brian," "Mr. Gregan" or "Defendant"), in accordance with Rule 32(o) of the Local Rules of Criminal Procedure, respectfully submits this memorandum in aid of sentencing in connection with the above-captioned matter.  Based on consideration of all the factors set forth in 18 U.S.C. § 3553(a), including the United States Sentencing Guidelines (the "Guidelines"), the Defendant asks the Court to impose a sentence of sixty (60) months imprisonment followed by sixty (60) months of supervised release with appropriate conditions. Such a sentence is certainly sufficient to meet the goals of sentencing, while also taking into account the circumstances unique to Mr. Gregan's offense and his two-year track record of post-arrest compliance with supervision and monitoring.

### INTRODUCTION

In 2010, Brian Gregan was discharged from his service in the United States Marine Corps. It was a devastating blow to the sense of purpose and meaning that he had once felt as a U.S. Marine.  Despite the struggles that ultimately led to his discharge, including a battle with substance abuse he developed while enlisted, Brian left the Marines having earned a Marine Corps Good Conduct Medal, Sea Service Deployment Ribbon, Iraq Campaign Medal, Global War on Terrorism Service Medal, National Defense Service Medal, and other honors awarded for merit.

But Brian also returned home with some far less celebrated marks of war. During his combat deployments he witnessed explosions of occupied American vehicles. In his role as a lead scout gunner, he was responsible for making first contact with civilians and sometimes the enemy. He witnessed first-hand the devastating injuries caused by the explosive devices he was charged with locating. And he recalls administering care to his team leader who was suffering from a laceration that would prove fatal. Following a deployment to Iraq, Brian developed symptoms of depression, anxiety, and Post-Traumatic Stress Disorder. After his second deployment, he become lost, depressed, and felt increasingly alone. His struggles with alcohol grew worse, and he was discharged from the role that had once given him purpose. As Brian's mother personally observed, his time in the military "really broke him down." (PSR at ¶ 58). He came home noticeably different than when he left. And, like so many veterans of the war in Iraq, Brian didn't seek professional help immediately upon his return.[1] Instead, he turned to alcohol and other substances to blunt the feelings and changes in himself he didn't understand.

It was during the low of these dark times that Brian committed the offense for which he is now to be sentenced. He had retreated inward. (PSR at ¶ 58). He was abusing alcohol. He was not taking care of himself. (PSR at ¶ 28). It was in this time that Mr. Gregan met and had a consensual sexual relationship with a 16-year-old female ("MV-2"). And, eventually, he engaged in a sexually explicit conversation with the minor victim ("MV-1") after reading a personal ad posted by MV-1. It was in the context of that latter conversation that Mr. Gregan received from MV-1 material constituting child pornography as described in the charge of conviction. It is a time

---

[1] *See* Tanielian, Terri and Lisa H. Jaycox, eds., *Invisible Wounds of War: Psychological and Cognitive Injuries, Their Consequences, and Services to Assist Recovery*. Santa Monica, CA: RAND Corporation, 2008. (*available at* https://www.rand.org/pubs/monographs/MG720.html) (finding roughly half of Iraq war veterans do not seek treatment for PTSD).

marked by decisions that Brian deeply regrets and it is criminal conduct he promptly acknowledged.

Notably, more than six months after Brian terminated his conversation with MV-1 and made no further contact, he was approached by a local police detective investigating a related matter in which MV-1 had communicated with and sent the same images and video to another person. Mr. Gregan was cooperative and candid about what he had done; he admitted to his offense conduct and consented to a search of his electronic devices. (PSR at ¶ 17). Searches of those devices revealed no child pornography on Mr. Gregan's devices beyond a short video of MV-2, the timing and circumstances of which, including Mr. Gregan's knowledge of it, were not clear. (PSR at ¶ 23). Brian forthrightly acknowledged receipt of the two images and one video sent by MV-1, though he had deleted them from his device long ago. Ultimately, the information Mr. Gregan provided to the police resulted in his own arrest. But since his arrest, Brian has diligently participated in bi-weekly counseling. He has also studied for, earned, and maintained a commercial driver's license and has maintained steady employment. And, importantly, he has had no instances of noncompliance in his nearly two years of intensive pretrial supervision. He has worked to move past conduct born of his lowest point, but he also accepts that he will be sentenced to a significant period of incarceration.

## LEGAL FRAMEWORK

In sentencing a defendant, courts are obligated to calculate the sentencing range recommended by the Sentencing Guidelines, though they should not treat that range itself as mandatory or presumptive. *Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Nelson v. United States*, 555 U.S. 350, 351-52 (2009). Courts are to treat the guidelines range as "one factor among several" to be considered when imposing an appropriate sentence under § 3553(a). *Kimbrough v*

*United States*, 552 U.S. 85, 90 (2007).  Thus, courts are to "consider all of the § 3553(a) factors," and "make an individualized assessment based on the facts presented."  *Beckles v. United States*, 137 S. Ct. 886, 894 (2017) (citing *Gall* at 49-50).  The Court's most basic duty, however, is to "impose a sentence sufficient, *but not greater than necessary*' to accomplish the goals of sentencing."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *Pepper v. United States*, 562 U.S. 476, 491 (2011) (emphasis added).

With respect to the child pornography guidelines specifically, courts and policymakers have each recognized the challenges in achieving equity in sentencing due to the wide range of differences in offenders and offense conduct.  Indeed, where the sentencing guidelines calculation is largely driven by an already-high base offense level—here, 22—sentencing judges have frequently imposed low or below-guidelines sentences for offenders who possess fewer images than the typical offender, engage in shorter-term and less methodical behavior than the typical offender, and those who do not evince a sexual interest in very young or prepubescent children.

For example, in 2012, the Sentencing Commission prepared a report on the child pornography guidelines for offenders who—like Mr. Gregan—had been convicted of offenses not involving the production of child pornography (so-called "non-production offenses").  *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) (the "2012 U.S.S.C. Report").[2]  The Commission produced the report in response to the trend of district courts imposing below-guidelines sentences for offenders sentenced under USSG § 2G2.2.  *Id.* (noting that "below range sentences for reasons other than an offender's substantial assistance to the authorities likewise ha[d] increased significantly…" to 62.8% in 2011).

---

[2] *Available at* https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses.

The Commission's Report was prepared with the ultimate goal of addressing "whether the guidelines [we]re in need of revision in light of feedback from judges as reflected in their sentencing decisions." *Id.* at Executive Summary, page ii.  The Commission also sought to address a particular problem it identified in child pornography sentencing—namely, the failure to appropriately distinguish among offenders "based on their degrees of culpability." *Id*.

The Commission also observed that "technological changes ha[d] resulted in exponential increases in the volume and ready accessibility of child pornography." *Id.* at 6.  On the one hand, this dramatic increase in volume of images among offenders resulted in the typical defendant possessing "many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6.  As a result, "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," and defendants were subject to higher base offense levels than before.  *Id.* at xi.  On the other hand, the Commission noted the emergence of self-made images, voluntarily produced by minors, without an adult producer's involvement.  These images, the Commission noted, should be distinguished from those produced by or through coercion by adult producers.  *See id*. at 109.

Thus, both the widely applied enhancements and the already-high base offense levels for non-production offenses were resulting in guideline ranges that were seen as "overly severe for some offenders in view of the nature of their collecting behavior." *Id.*  At the same time, the original aims of child pornography were recognized as ill equipped to address new forms of material constituting child pornography created in the absence of coercion or adult involvement.

In contrast to the "vast majority of offenders" with large collections of material, Mr. Gregan received two photographs and one video from MV-1 before terminating the conversation.

Mr. Gregan did not produce any of those images, nor were they produced at his request.  (PSR at ¶17).  Brian also did not save, distribute, or demonstrate any intention to distribute, those images. Unlike many other offenders, he also did not engage in trading, purchasing, or otherwise engage in the illicit marketplace for prohibited material.

In describing the varying degrees of culpability among child pornography defendants, the Commission also reported that the "typical" child pornography case involved images depicting "prepubescent children engaging in sexually explicit conduct."  *Id.* at 84.  In fact, in non-production cases from fiscal year 2010, "*96.3%* of offenders possessed child pornography depicting prepubescent minors or minors under 12 years of age."  The Commission noted that some of these offenders "acquire enormous and often well-organized collections," with image quantities in the hundreds of thousands of images.  Some offenders "intentionally collect[ed] child pornography depicting the sexual torture of children, including infants and toddlers," *id.* at viii, 84-92.  Some collected material over "a series of decades."  *Id.* at 80.

Here, Brian is readily differentiated from these more culpable child pornography offenders.  Mr. Gregan evinced no interest in prepubescent children and possessed no material depicting them.  He is, therefore, within the *3.7%* of offenders who do not possess images of these very young victims.  Indeed, in discussing the gradations of culpability, the Commission made express note that "not all child pornography offenders are pedophiles," *id.* at 104, and courts have recognized the absence of such behavior as a reason to vary from the Guidelines. *See, e.g., United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (affirming downward variance in part because the defendant did not fit the profile of a pedophile).  Further, Brian's conduct represents a remarkably short period in his otherwise law-abiding life.  His conduct did not span decades, and he has spent two years in compliance with intensive pretrial supervision.

- 6 -

In its report, the Commission ultimately recommended that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (*e.g.*, the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at 322-23.

Here, Mr. Gregan's conduct was relatively short when compared to other offenders, he did not possess large numbers of images or catalogue them, and his post-arrest conduct demonstrates a willingness and ability to comply with supervision and participate in needed therapy.

## THE SENTENCING FACTORS

I.      **The Sentencing Factors In 18 U.S.C. § 3553(a) Support a Sentence of 60 Months**

In keeping with the purposes of the federal sentencing scheme, the circumstances particular to this defendant justify a sentence at the low end of the sentencing guidelines range.  In particular, a sentence to the mandatory minimum sentence of 60 months' imprisonment, followed by 60 months of supervised release, is more than sufficient to meet the purposes of sentencing for this true first offender.

A.      **The History and Characteristics of The Defendant and The Nature and Circumstances Of The Offense**

*Early Life, Family and Employment*

- 7 -

Brian Gregan grew up in Connecticut with his mother, father, and younger brother.  When Brian was just 10 years old, however, his parents divorced and his father left the home.  The divorce set off a period during which Brian's father was absent and visits were increasingly infrequent.  Brian, at 10, felt a distinct sadness about his parents' separation that he still feels to this day.  Despite this, Brian maintained a very close relationship with his mother who never remarried.  She worked and raised Brian and his brother as a single parent, though Brian also had a close relationship with his maternal grandparents, who helped raise him for periods of time until they passed away.  Brian admired his grandfather who had served in the Navy.  Brian hoped one day to emulate him and serve his country as well.

Brian graduated from high school in 2005 and promptly enlisted in the United States Marine Corps.  He was successful in training.  He was skilled in his specialty.  And he would eventually train others.  Brian had found the sense of purpose he was seeking.  (*See* below).



(Brian Gregan as a U.S. Marine)

As mentioned above, however, Brian's struggles with his mental health and with alcohol began after his first deployment to Iraq. They worsened with is return from his second deployment, and ultimately led to his discharge from the Marines. It took Brian some time to adjust to his new civilian life. He would ultimately find employment, earn a commercial driver's license, and graduate from tractor trailer training school. While on pretrial release, he has been able to maintain fulltime employment where is a valued and responsible employee.

In his private life, Brian is described as "very willing to help others" and "a caring person." (PSR at ¶ 55). His steady employment, his forthright admission of guilt, and his commitment to ongoing counseling over this past year also show him to be a man who is responsible, honest, and invested in his future.

_The Offense_

On October 7, 2019, Mr. Gregan waived indictment and pled guilty to one count of receipt of child pornography. The offense arises out of an electronic conversation he had in 2017, with MV-1, during which MV-1 sent two photographs and a video constituting prohibited material under 18 U.S.C. § 2252A(a)(2).

As alleged in the Information, the conversation at issue in the count of conviction took place sporadically over the course of a three-day period. In the course of that conversation, Mr. Gregan received a small number of images constituting child pornography taken by MV-1. During this time, he was not seeking professional help for his anxiety, depression, or substance use issues, which had grown worse since the time of his combat deployments and subsequent discharge from the Marines.

*Post Arrest*

Although Mr. Gregan's waiver and plea in this Court took place in October 2019, for Mr. Gregan, this matter began with his voluntary interview with police and subsequent arrest in early 2018 by the State of Connecticut.  That arrest concerned exactly the same conduct at issue in this case and constituted Mr. Gregan's first interaction with the criminal justice system in his life.  At that time, he was placed on intensive pretrial supervision, including weekly visits with a probation officer, substance abuse testing, and location monitoring and curfew requirements.  For the year and a half leading up to his waiver and plea in federal court, Mr. Gregan was fully compliant with his intensive supervision and had no issues of noncompliance while residing and working in the community.

In early 2019, Mr. Gregan also chose to address previously unaddressed issues that had been plaguing him since his time in the military, this time with professional help.  Although his discharge precluded him from using the mental health services provided by the United States Department of Veterans Affairs, Mr. Gregan took the initiative to work with a veterans' legal assistance organization to appeal his discharge status and sought out treatment through the Hartford Vet Center.  Since that time, he has attended counseling on a bi-weekly basis to address his underlying anxiety, depression, and alcohol abuse issues.

### B.   The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

There is no question that child pornography offenses are extremely serious.  The Sentencing Commission and Congress have each made this clear through the high guidelines ranges and the imposition of mandatory minimum sentences like the one applicable here.

There is similarly no dispute that Mr. Gregan must be sentenced to a minimum term of five years imprisonment—an unquestionably significant period of incarceration—which represents a

sentence within the applicable guidelines range calculated in Mr. Gregan's plea agreement.  *See* 18 U.S.C. § 2252A (setting five-year mandatory minimum for the offense of receipt of child pornography).  Thus, Mr. Gregan's sentence will not only be significant, but will reflect precisely the degree of seriousness thought necessary by Congress and the Sentencing Commission.

A sentence at the low end of the applicable Guidelines range in this case directly coincides with the statutory minimum Congress deemed appropriate in such cases.  Such a sentence is will also be sufficient to reflect the seriousness of Mr. Gregan's offense when viewed in relation to the broader aims of child pornography sentencing.  Indeed, one of the articulated justifications for the most serious punishments applicable to such offenses has been the deterrence of those who participate in the broader marketplace for child pornography, thereby encouraging the production of more material depicting the abuse of children for sale and distribution.  *See* 2012 U.S.S.C. Report at 98 ("criminal punishments for the production, distribution, receipt, and possession of child pornography in part have been based on the belief that such punishments will help 'destroy' (or at least significantly reduce) the 'market' for child pornography.").

Here, Mr. Gregan was not a purchaser, distributer, trader or collector of child pornography from the illicit market sought to be targeted by these most severe punishments.  Mr. Gregan did not participate in or contribute to the broader supply or demand driving the market for production or distribution of child pornography.  Thus, the kind of longer sentence thought to be appropriate for a participant in the marketplace for such material, would not serve the same purposes with respect to Mr. Gregan.  Increased punishment for Mr. Gregan will not affect the marketplace for child pornography that Congress intended to target and destroy through increased punishment because he did not participate in that illicit community.

In addition, the proliferation of computers, cell phones, and other technology has changed the nature and context within which this particular offense occurred.  Before the advent of cell phones with cameras and internet access, material constituting child pornography could not readily be created and distributed by minors themselves.  Rather, the images were produced and distributed by suppliers directly to other offenders in hard copy or by mail.  *See* 2012 U.S.S.C. Report at 6.  These images were produced in the context of abuse, not voluntarily by those depicted in them.  This contributed to the very few child pornography prosecutions in the 1990s, when prosecutions were focused on those who deliberately engaged in the market for such material, and in which less than one quarter of offenders used a computer.  *See* U.S. Sent'g. Comm'n, *Report to the Congress: Sex Crimes Against Children* (June 1996).  By contrast, in 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer. U.S. Sent'g. Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011); U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.17.

Today, however, studies show that roughly one in four young people between the ages of 11 and 18 sends and receives sexually explicit images of themselves—a dramatic increase from prior years.[3]  A 2018 study published in the Journal of the American Medical Association concluded that this kind of youth "sexting" may be a "potentially normal component of sexual behavior and development," correlated with "youth having greater access to and/or owning smartphones."[4]  And while these images are no less illegal for adults to receive or possess, the

---

[3] Madigan S, Ly A, Rash CL, Van Ouytsel J, Temple JR. Prevalence of Multiple Forms of Sexting Behavior Among Youth: A Systematic Review and Meta-analysis. *JAMA Pediatr.* (2018) 327–335 (*available at* https://doi.org/10.1001/jamapediatrics.2017.5314).
[4] *Id.*

circumstances in which they are generated by the victims are sufficiently different to warrant consideration in sentencing.

As recognized in 2012 by the Sentencing Commission, these technological changes have certainly dramatically increased the accessibility of material constituting child pornography, and the current guideline "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors" and is "overly severe for some offenders in view of the nature of their collecting behavior." 2012 U.S.S.C. at 322-23. But, at the same time, technological advances have led to the existence of a new type of child pornography that is not the product of the same types of abuse and coercion as the guidelines originally envisioned. In the case of individuals like Mr. Gregan, who did not deliberately or discriminatingly collect, retain or catalogue images of child pornography, but rather received an increasingly common kind of self-generated image, the guideline fails to differentiate such offenders from those who trade in images generated in the context of abuse of minors or who contribute to the broader marketplace for such material.

Finally, a sentence of 60 months is more than sufficient to impose "just punishment." In addition to the mandatory period of incarceration and supervised release, Mr. Gregan accepts that he will lose the job he worked so hard to attain due to his conduct. When released, Mr. Gregan must also register as a sex offender and live with ongoing restrictions on his liberty even after his release from custody. Information about his offense will be made known to the community, to his friends, his neighbors, and his future employers. Courts recognize that such collateral consequences are relevant to the need for the sentence imposed to reflect just punishment.

As the Second Circuit held in United States v. Stewart, 590 F.3d 93, 141 (2d Cir. 2009), "It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider

the collateral effects of a particular sentence." *See, also United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (holding it was not inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," and "adequate deterrence."); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis….")

In consideration of these aims of sentencing, Mr. Gregan submits that a sentence of 60 months' imprisonment adequately reflects the seriousness of the offense and sends a strong message that even conduct involving a small number of images will be punished severely.

**C.    The Need for the Sentence to Afford Adequate Deterrence, Protect the Public, and Provide the Defendant with Needed Educational, Vocational, and Treatment Services in the Most Effective Manner**

Empirical evidence is clear that there is no relationship between the length of a sentence and either general or specific deterrence, without regard to the type of crime charged. *See* Valerie Wright, *Deterrence in Criminal Justice*, The Sentencing Project (2010) (summarizing a series of studies that have found no meaningful relationship between length of sentence and deterrence); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28- 29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any)

marginal deterrent effects.")[5]; Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (finding variations in prison time and probation "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").[6]

The Sentencing Commission itself has found that "[t]here is no correlation between recidivism and guidelines' offense level," and that "the guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004).  And courts have also acknowledged that lengthy periods of imprisonment for child pornography offenders have no deterrent or preventive effect on the production or dissemination of child pornography.  That is, in general, there is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1103 (N.D. Iowa 2009).  But more specifically to Mr. Gregan, lengthy imprisonment could not deter the flow of child pornography distribution because Mr. Gregan did not engage in any trafficking activity at all and did not even retain the prohibited material he received.

With respect to the deterrence achieved by noncustodial conditions—namely, supervised release—Mr. Gregan will be subject to a mandatory minimum period of supervision of not less

---

[5] *Available at*
https://pdfs.semanticscholar.org/0b77/7046395815efb1742602abce4010b4f5eb63.pdf.
[6] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1477673.

than five years.[7]   But if Mr. Gregan's two years of intensive pretrial supervision and location monitoring make one thing clear, it is that Mr. Gregan can safely live within the community under appropriate conditions.   Indeed, in his plea agreement, Mr. Gregan has stipulated to a number of stringent conditions designed to protect the public and prevent re-offense.   His success in two years of intensive pretrial supervision are a strong indicator that he can succeed on supervised release. It has been nearly three years since his offense without incident.

### D.    The Kinds Of Sentences Available

The statutory maximum for the offense of conviction is 20 years, with up to a lifetime term of supervised release.   Although this is Mr. Gregan's first offense, there is a mandatory minimum sentence of imprisonment of five years' imprisonment, followed by a minimum of five years of supervised release.

### E.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty Of Similar Conduct

Brian is a first-time offender.   He was not a collector of child pornography.   He did not purchase, sell, distribute or otherwise traffic in such material.   And his conduct represents a relatively short period in his life when compared to other offenders with longer histories of criminal conduct.   Indeed, in this circuit, courts have imposed and affirmed sentences equivalent to the sentence requested here even where the circumstances indicated more sustained conduct, even including distribution of child pornography.   *See, e.g., United States v. Sterzelbach*, 338 F.

---

[7] Although the sentencing guidelines currently contain language suggesting that the "statutory maximum sentence of supervised release" should be imposed in all sex offenses, *see* §5D1.2(b), that recommendation was made before the enactment of the PROTECT Act of 2003, which raised the statutory maximum term of supervision from *three years* for most child pornography offenders to a lifetime term for all child pornography offenders.   Subsequent guidance from the Sentencing Commission has clarified that this language is under review and that more guidance in fashioning a term of supervised release is needed.

App'x 73, 75 (2d Cir. 2009) (affirming 60-month sentence where defendant not only possessed child pornography, but "trad[ed] child pornography on-line for ... two or three years" and facilitated the distribution of child pornography.).

By contrast, Brian's conduct with respect to the count of conviction spanned just three days. And despite the language of the conversation, Brian terminated the conversation with MV-1 without any attempt to re-initiate contact long before being contacted by the police.

Brian's sentence in this case is largely determined by a statutory mandatory minimum for a first-time charge of receipt of child pornography in a way that it would not be for similarly situated defendants convicted of possession of child pornography. However, the distinction between those convicted of receipt and possession (for which no mandatory minimum applies) is one that even the Sentencing Commission has expressed some concern about. Since 1990, when Congress first specified "simple possession" of child pornography as a prohibited act, the Sentencing Commission has taken the position that, "because receipt is 'a logical predicate' to possession, 'there appears to be little difference in the offense seriousness between typical receipt cases and typical possession cases.'" 2012 U.S.S.C. Report at 326-27. Consistent with this view, the Criminal Law Committee of the Judicial Conference recommended that Congress remove the statutory mandatory minimum penalty for receipt because "there is no meaningful difference between receipt [and] possession." *Id.* Indeed, in 2010, the Sentencing Commission conducted a survey of sentencing judges, in which "a clear majority stated that current statutory penalty levels for receipt cases are excessive." *Id.* Moreover, a separate analysis performed by the Sentencing Commission of non-production child pornography cases found inconsistent charging practices resulting in significant unwarranted sentencing disparities among offenders charged with receipt and similarly situated offenders charged with possession. *See id.*

Nonetheless, Brian is readily differentiated from other more typical child pornography offenders and a sentence of 60 months is therefore warranted.  As noted above, Brian is among just 3.7% of child pornography offenders who showed no interest in and possessed no material depicting prepubescent minors.  Brian did not collect or even deliberately retain the offending material.  His conduct involved the equivalent of tens, not hundreds or thousands, of images. Brian's pre-offense and post-offense conduct, his mental state following service in the military, and his efforts to rehabilitate himself and his acceptance of responsibility, each set him apart from other offenders convicted of similar offenses.

### F.    Consideration Of The Sentencing Guidelines

### 1.    Offense Level

Brian pled guilty to one count of receiving child pornography in violation of 18 U.S.C. § 2252A.  The offense of conviction involved two pictures sent to Mr. Gregan, as well as one video. Accordingly, the parties agree that the base offense level is 22 with 2 points added for an offense involving more than 10, but fewer than 150 images[8] and 2 points subtracted because Mr. Gregan's conduct involved only the receipt of child pornography, with no intent to traffic or distribute such material.  The parties disagree as to whether an enhancement applies under § 2G2.2(b)(6).  Finally, the parties agree that 3 points are subtracted due to Mr. Gregan's acceptance of responsibility.

Thus, the defendant calculates the guidelines, as follows:

a.    Base Offense Level, Offense Guideline, § 2G2.2(a)(2);          22

No Intent to Traffic or Distribute § 2G2.2(b)(1);          -2

---

[8] Although the PSR calculates the guidelines by applying the enhancement for more than 150 images on account of the video of MV-2 recovered from Mr. Gregan's iPad, the forensic evidence is unclear as to the circumstances under which that video came to be in the deleted folder of Mr. Gregan's iPad.  Mr. Gregan also submits that the Court may appropriately depart pursuant to *United States v. Fernandez*, in recognition of the guidelines calculation concerning number of images set forth in the plea agreement.

|  | Use of a Computer § 2G2.2(b)(6) | +2 |
|---|---|---|
|  | Fewer than 150 images §2G2.2(b)(7)(A) | +2 |
|  | Acceptance of Responsibility, § 3E1.1 | -3 |
| b. | Adjusted Offense Level | 21 |

**2.   Criminal History**

Mr. Gregan's criminal history category is properly calculated by the PSR as a Category I based on the criminal history score of zero.  Put simply, Mr. Gregan is a true first offender.

**3.   Sentencing Table**

An Adjusted Offense Level of 21 and a Criminal History Category of I result in a Guidelines range of 37-46 months, which is adjusted to 60 months by operation of the applicable mandatory minimum.  By contrast, the Adjusted Offense Level of 25 advocated by the government would result in a Guidelines range of 57-71 months, with 60 months falling squarely within the guidelines range.

**4.   The Enhancement Under § 2G2.2(b)(4)**

The government takes the position that a four-level enhancement under § 2G2.2(b)(4) should apply in this case.  As grounds for this significant enhancement, the government explains that MV-1 sent a video to Mr. Gregan, in which MV-1 is alone, inserting a hairbrush handle into his own anus.  As to the objective content of this image, the parties do not disagree.  However, the government contends that this video depicts sadistic or masochistic conduct as required for the 4-level enhancement in § 2G2.2(b)(4) to apply.  Yet the content of the video does not depict the sort of violent, painful, or coercive conduct for which the enhancement appears intended and to which the terms "sadistic" or "masochistic" appropriately apply.

"The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning...." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011); *United States v. Hatten*, No. 06-4240, 2007 WL 1977663, at *2 (4th Cir. July 5, 2007) (same); *United States v. Carbajal-Valdez*, 874 F.3d 778, 784 (1st Cir. 2017) (undefined terms in the guidelines should customarily be given their plain and ordinary meaning) (citing *Chapman v. United States*, 500 U.S. 453, 473 (1991)).  When the Guidelines do not provide a definition, courts in this circuit have turned to the ordinary meaning of undefined words, including by reference to the dictionary.  *See United States v. Acosta*, 963 F.2d 551, 559 (2d Cir. 1992) (applying dictionary definition to word "mixture" in absence of Guidelines definition).

Because the Guidelines do not define the phrase "sadistic or masochistic conduct or other depictions of violence," the court may look to the accepted definitions of those words.  Indeed, some courts considering the issue have appropriately defined "sadism" as "the infliction of pain upon a love object as a means of obtaining sexual release."  *United States v. Lyckman,* 235 F.3d 234, 238 n. 19 (5th Cir.2000), *cert. denied,* 532 U.S. 986 (2001); *United States v. Freeman,* 578 F.3d 142, 145–46 (2d Cir.2009) (identifying "delight in physical or mental cruelty" as an ordinary definition of "sadistic" (quoting *Webster's Third New International Dictionary* 2254 (1986))); *United States v. Hoey,* 508 F.3d 687, 691 (1st Cir. 2007) (same); *United States v. Rearden,* 349 F.3d 608, 615 (9th Cir. 2003) (same); *but see United States v. Parker,* 267 F.3d 839, 847 (8th Cir.2001) (stating that "the terms 'violence' and 'sadism,' as ordinarily used, are not limited to activity involving a rope, belt, whip, chains, or other instruments" and determining that "painful, coercive, abusive, and degrading" conduct also qualify as "sadistic" under the Guidelines), *cert. denied,* 535 U.S. 1011 (2002).  Thus, the hallmark of both sadism and masochism is pain, or, at a minimum, objectively and deliberately coercive, abusive or degrading.

In this case, the video in question does not objectively depict violence or the infliction of pain. Nor does it depict a minor being subjected to conduct objectively for that purpose. Rather, it depicts a solitary and voluntary act of self-stimulation, without coercion or any objective manifestation pain.

To be sure, some courts have taken the view that the enhancement for sadistic and masochistic conduct is not limited to images that depict exclusively physical pain. Rather, they have read the terms to include depictions of degrading and humiliating conduct causing mental suffering. *See, e.g., United States v. Turchen,* 187 F.3d 735, 739 (7th Cir.1999) (concluding that the terms sadistic and masochistic also include "sexual gratification which is purposefully degrading and humiliating [and] conduct that causes mental suffering or psychological or emotional injury in the victim" and that the enhancement may therefore be warranted even when images do not portray any kind of violence); *United States v. Comeaux,* 445 Fed. Appx. 743, 745 (5th Cir. 2011) (observing that "many depictions which are unarguably sadistic in nature do not involve violence or pain, but rather subjugation and humiliation").

Importantly, however, in order to apply the § 2G2.1(b)(4) enhancement, sentencing courts are to determine by a preponderance of the evidence that an image or material *objectively* portrays conduct that is inflicting physical pain, emotional suffering, or humiliation on that minor. *See United States v. Bleau*, 930 F.3d 35, 41–42, n.20 (2d Cir. 2019) ("[T]he determination of whether an image is sadistic under U.S.S.G. § 2G2.2(b)(4) is an objective one.").

To the extent that some courts have held that images depicting the penetration of a minor with a foreign object may alone be sufficient for purposes of the guidelines enhancement, these decisions principally provide that the penetration of a *prepubescent* or very young child meets this definition. *See, e.g., United States v. Delmarle*, 99 F.3d 80, 83 (2d Cir. 1996) (concerning eight-

or nine-year-old boy penetrated by adult male); *United States v. Quinn*, 257 F. App'x 864, 867 (6th Cir. 2007) (collecting cases applying enhancement, each of which addressed penetration *of prepubescent* minor or penetration *by* an adult).   In this case, the video does not depict a prepubescent child.  There is also no objective manifestation of humiliation or disgust on the part of MV-1.  To the contrary, the video sent by MV-1 depicted an act apparently undertaken voluntarily by himself, without evincing the infliction or intended infliction of pain or inducement to engage in the conduct depicted. Under similar circumstances, application of the enhancement has been held to be inappropriate. *See, e.g., United States v. Meillier*, No. 07-CR-158 (PJS), 2008 WL 2564128 (D. Minn. 2008) (holding that penetration of one minor by another close in age, in the absence of evident pain or violence, does not constitute "sadistic or masochistic conduct).

In responding to the defense objections in the PSR, the government points to *United States v. Young*, 672 F. App'x 973 (11th Cir. 2017), as support for the application of the enhancement to the kind of voluntary conduct depicted here.  That case, however, is readily distinguisged.  There, although the depiction involved a 13-year-old girl penetrating herself apparently of her own volition, the object was a stick.  This is distinct in significant ways from the handle of hairbrush, which studies have even identified as the kind of object frequently used for self-pleasure.[9]

Indeed, in one recent decision, *United States v. Bleau*, 930 F.3d 35, 41–42 (2d Cir. 2019), the Second Circuit considered the application of § 2G2.2(b)(4) to videos portraying a minor victim

---

[9] *See*, e.g., Wood, Jessica & Crann, Sara & Cunningham, Shannon & Money, Deborah & O'Doherty, Kieran. (2017). A cross-sectional survey of sex toy use, characteristics of sex toy use hygiene behaviours, and vulvovaginal health outcomes in Canada. The Canadian Journal of Human Sexuality (Fig. 2) (identifying the end of a hairbrush as an object used for self-stimulation in 1.37% of study participants as distinct from "BDSM toys") (*available at* https://www.utpjournals.press/doi/full/10.3138/cjhs.2017-0016); *see also* DeMartino, Manfred, *Human Autoerotic Practices*, Human Sciences Press (1979), at p. 267 (noting that "both [sexes] have used a wide variety of small and large objects, including hairbrush handles … for anal masturbation.").

performing sex acts upon herself while using a vibrator and other sex toys.  *Id.*  As here, the District

Court could not conclude from the images whether the depicted activity caused the minor victim

to experience *physical* pain, but found instead that the videos "depict[ed] a child between the ages

of 12 and 14 ... being mentally degraded and humiliated and harmed" and that "objectively, the

child [wa]s being degraded and humiliated *having to use* this vibrator and the male sex toy."  *Id.*

(emphasis added).  It found that one of the videos portrayed a child who "appear[ed] to be quite

nervous," was "biting her fingernails," "ha[d] a look that [the District Court could] only describe

as sadness," and "[a]t one point place[d] her hand over her face to partially obscure her face."  *Id.*

On these facts, the Second Circuit found that it was "*a very close* case" for the application

of the enhancement in § 2G2.2(b)(4).  But if *Bleau* was a "very close case," then application of

2G2.2(b)(4) plainly is not warranted here.  Unlike the objective indications in *Bleau* that the victim

was coerced ("having to use" the sex toys at issue), or was visibly nervous, sad, or embarrassed,

none of these objective manifestations of coercion, pain, or humiliation are present in the video at

issue in this case.  And while the video is unquestionably illegal and constitutes child pornography

for which the guidelines will already impose punishment, it depicts an act that is undertaken by

many as an act of self-stimulation, and not for sadistic or masochistic reasons. Thus, application

of the 4-level enhancement is unwarranted.

### 5.     Departure/Variance Considerations

In fashioning the Guidelines, the Sentencing Commission intended for courts to "treat each

guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each

guideline describes."  United States Sentencing Manual, Chapter 1, Pt. A.  However, "[w]hen a

court finds an atypical case, one to which a particular guideline linguistically applies but where

conduct significantly differs from the norm, the court may consider whether a departure is warranted." *Id.* Here, there are grounds for the Court to consider a departure for this very reason.

As set forth in the preceding section, even if the Court were to determine that the application of the 4-point enhancement under § 2G2.2(b)(4) could linguistically apply in this case, the circumstances here are not within the heartland of cases involving the receipt or possession of sadistic or masochistic images. To the contrary, the video clip at issue in this case depicts an act more commonly viewed as an act of self-stimulation, using an object that studies have shown is often used. Additionally, although several courts have held that § 2G2.2(b)(4) contains no scienter requirement (i.e. no express requirement that the defendant intended to receive material depicting sadistic or masochistic behavior), the fact that Mr. Gregan did not intend for MV-1 to send a video, much less a video depicting the act at issue here, takes this case further outside the heartland of cases for which the enhancement was apparently intended.

Accordingly, a departure or variance would be warranted to offset, or substantially mitigate, the application of § 2G2.2(B)(4) where the defendant did not intend to receive a video depicting sadistic or masochistic content, and where the conduct depicted is not clearly and objectively sadistic or masochistic.

This court may also consider a variance based on a number of attributes particular to the defendant and this case based on consideration of the § 3553(a) factors. For or example, in *United States v. Hucki*ns, 529 F.3d 1312 (10th Cir. 2008), the court affirmed a downward variance based on the defendant's lack of significant criminal history, depression at the time of the offense, short time period in which the offense took place, lack of repeat offending by the defendant after his arrest, significant self-improvement efforts during the year and a half in which he waited to be prosecuted, and the defendant's young age when he committed the offense of conviction.

Here, Mr. Gregan has no criminal history.  Mr. Gregan was not just suffering from depression at the time of his offense, as in *Huckins*, but was contending with the symptoms of untreated trauma from his multiple combat deployments in the Iraq war.  He also has not re-offended in the two and a half years since the offense, the offense spanned a short time period, and he has undertaken significant improvements since the time of the offense to re-establish meaning and purpose in his life, having earned a commercial driver's license and securing full time employment because of it.

Lastly, as noted above, if the Court were to agree with the calculation of the sentencing guidelines in the PSR with respect to the number of images, the defendant would ask the court to depart in keeping with *United States v. Fernandez*, to give effect to the parties' plea agreement in this case.

## II.    A Sentence That Provides a Meaningful Opportunity for Rehabilitation and Contribution to Society While Still of Working Age is Reasonable and Appropriate

Finally, in the assessment of individuals convicted of sex offenses, prevalent evaluative tools used to assess future risk, as well as ongoing studies, make two important points clear: (1) there is an expected drop in the risk of re-offense after the defendant reaches the age of 35;[10] and (2) future treatment upon release is effective.[11]

---

[10] *See* Age at Release From Sex Offence, Static-99 (*available at* http://www.static99.org/pdfdocs/AgeCodingforStatic-99R-2012-08-20.pdf); *see also* Reoffense Risk Scale, Vermont Assessment of Sex Offender Risk (*available at* https://csom.org/pubs/VASOR-2ManualOctober2013.pdf); *see also See* Seto, Michael, Internet-Facilitated Sex Offending (describing CPORT risk assessment tool which scores offenders lower after age of 35) (*available at* https://www.smart.gov/SOMAPI/sec1/ch4_internet.html).
[11] *See* Seto, *id.* (explaining that "[t]reatments and other interventions that can successfully target dynamic risk factors are more likely to lead to reductions in recidivism" among child pornography offenders).

Here, Mr. Gregan committed the instant offense when he was 30 years old. At the time of sentencing, he will be 33. If he is sentenced to 60 months of imprisonment, he will begin supervised release when he is 38 years old—after the age of 35, and thus after a recognized drop on the risk of reoffense. Coupled with the mandatory treatment he will undergo upon his release from custody, Brian will re-enter the community (under stringent conditions he has already consented to), prior to turning 40. This will afford Mr. Gregan the opportunity to re-connect with employment and return to a productive life, while assuring the safety of the community.

A five-year period of incarceration will also afford Mr. Gregan the opportunity to focus on addressing the severe problematic alcohol abuse issues that led to his discharge from the military and ultimately contributed to his offense conduct. As recommended in the Presentence Report, if designated to a facility offering the Bureau of Prisons' RDAP program, Mr. Gregan will be able to participate in a substance abuse program to better equip him to avoid the problematic relationship with alcohol he developed following his combat deployments. If released after a five-year period of incarceration, he will be able to continue his treatment in the community before his fortieth birthday, providing a better opportunity for a productive future. Accordingly, Mr. Gregan would request a recommendation for a designation to FCI Danbury, FCI Fort Dix, FCI Elkton, or any of the facilities identified in paragraph 111(A) of the PSR.

## **CONCLUSION**

For all the foregoing reasons, the Defendant respectfully requests that the Court, after consideration of all the factors in 18 U.S.C. § 3553(a), impose a sentence of sixty months' imprisonment, followed by sixty months of supervised release.

THE DEFENDANT,
BRIAN GREGAN


By:    /s/ Michael G. Chase
        Michael G. Chase
        Federal Bar No. ct 28935
        Shipman & Goodwin LLP
        One Constitution Plaza
        Hartford, CT  06103
        Tel:  (860) 251-5194
        Fax: (860) 251-5219
        Email:  mchase@goodwin.com
        His Attorney

**<u>Certificate of Service</u>**

I hereby certify that on January 8, 2020, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

<div style="margin-left: 40%;">

<u>/s/ Michael G. Chase</u>
Michael G. Chase
Fed. Bar No. ct28935
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT  06103

</div>